RECORD NOS. 16-1357(L), 16-1421

ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

In The

# United States Court of Appeals

### For The District of Columbia Circuit

## E.I. DU PONT DE NEMOURS AND COMPANY,

*Petitioner*,

**v.**

## NATIONAL LABOR RELATIONS BOARD,

*Respondent*.

-----------------------------------------------------------------------------------------------------

## UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION,

*Intervenor for Respondent*.

### ON PETITION FOR REVIEW OF AN ORDER OF
### THE NATIONAL LABOR RELATIONS BOARD
_____

### REPLY BRIEF OF PETITIONER
_____

Thomas P. Gies
Kris D. Meade
Glenn D. Grant
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington D.C. 20004
(202) 624-2500
tgies@crowell.com
kmeade@crowell.com
ggrant@crowell.com

*Counsel for Petitioner*

THE LEX GROUP<sup>DC</sup> ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION ................................................................................... 1

ARGUMENT ........................................................................................... 3

I.   THE BOARD ARGUES FOR APPLICATION OF THE WRONG
     STANDARD OF REVIEW .............................................................. 3

II.  THE BOARD ERRED BY IGNORING THE PARTIES' SPECIFIC,
     LONGSTANDING AGREEMENT AS TO BENEFLEX ............................ 4

     A.   The BeneFlex Changes Are "Covered By" The Parties'
          Agreement ............................................................................ 5

III. THE PARTIES' *QUID PRO QUO* AGREEMENT AS TO
     BENEFLEX DEFINES THE *STATUS QUO* AND REMAINS IN
     EFFECT ....................................................................................... 10

     A.   The BeneFlex Changes Are Consistent With The Parties'
          BeneFlex Agreement ............................................................ 11

     B.   The 2004-2005 BeneFlex Changes Are Consistent With The 10-
          Year Past Practice Of Prior BeneFlex Changes .................... 16

IV.  THE BOARD'S REMEDIAL ODER IS ARBITRARY AND
     CAPRICIOUS ............................................................................... 24

CONCLUSION ...................................................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allentown Mack Sales and Serv., Inc. v. NLRB*,
  522 U.S. 359 (1988)..................................................................4

*Arc Bridges v NLRB*,
  662 F.3d 1235 (D.C. Cir. 2011)............................................ 24-25

*Auto Workers (Udylite Corp.) v. NLRB*,
  455 F.2d 1357 (D.C. Cir. 1970).............................................17

*Beverly Health & Rebab. Servs., Inc.*,
  346 N.L.R.B. 1319 (2006) .............................................16, 24

*Cactus Canyon Quarries, Inc. v. FMSHRC*,
  820 F.3d 12 (D.C. Cir. 2016)..................................................4

*Capital Ford*,
  343 N.L.R.B. 1058 (2004) .............................................16, 24

*Caterpillar, Inc.*,
  355 N.L.R.B. 521 (2010) ........................................................20

*Circle Imp Ex. Co.*,
  244 N.L.R.B. 255 (1979) .........................................................7

*Courier-Journal, Inc.*,
  324 N.L.R.B. 1093 (2004) .............................................16, 24

*Daily News of Los Angeles*,
  315 N.L.R.B. 1236 (1994) ....................................... 16-17, 20, 21, 22

*Dep't of Navy v. FLRA,* 962 F.2d 48 (D.C. Cir. 1992)............................10

*Dynatron/Bondo Corp.*,
  323 N.L.R.B. 1263 (1997) *enf'd n relevant part*, 176 F.3d 1310
  (11th Cir. 1999)............................................18, 19, 20, 21, 22

*E.I. DuPont de Nemours & Co. v. NLRB*,
  682 F.3d 65 (D.C. Cir. 2012)...............................................11, 12, 24

*Eastern Maine Med. Ctr. v. NLRB*
    658 F.2d 1 (1st Cir. 1981)..........................................................18, 19, 20, 21, 22

*Enloe Med. Ctr. v. NLRB*,
    433 F.3d 834 (D.C. Cir. 2005)......................................................................3, 10

*Finley Hospital*,
    362 N.L.R.B. No. 102 (2015), *enforcement denied*,
    551 F.3d 772 (8th Cir. 2016) .............................................................................11

*In re General Motors*,
    3 F.3d 980 (6th Cir. 1993) ................................................................................15

*Gen. Motors Acceptance Corp.*,
    196 NLRB 137 (1972) .......................................................................................17

*H.K. Porter Co. v. Local 37, United Steelworkers of America*,
    264 F.Supp. 203 (S.D.W.Va. 1967).............................................................. 13-14

*Heartland Plymouth Court MI, LLC, v. NLRB*,
    650 Fed. Appx. 11 (D.C. Cir. 2016) .........................................................4, 7, 10

*IBT, v. W. J. Digby, Inc.*,
    341 F.2d 1016 (10th Cir. 1965) .......................................................................15

*Jacoby v. NLRB*,
    233 F.3d 611 (D.C. Cir. 2000)............................................................................4

*Litton Fin. Printing Div. v. NLRB*,
    501 U.S. 190 (1991).....................................................................................3, 10

*Litton Microwave Cooking Prods*,
    300 N.L.R.B. 324 (1990), *enf'd*, 949 F.2d 249 (8th Cir. 1991) .......17, 20, 21, 22

*Local 702, Broth. of Elect. Workers v. NLRB*,
    215 F.3d 11 (D.C. Cir. 2000)..............................................................................3

*Local Union No. 115, United Ass'n of Journeymen and Apprentices of
    Plumbing and Pipe Fitting Industry v. Townsend & Bottum, Inc*.,
    383 F. Supp. 1339 (W.D. Pa. 1974), aff'd, 521 F.2d 1399 (3d. Cir.
    1975) ...................................................................................................................16

*Luther Manor Nursing Homes*,
   270 N.L.R.B. 949 (1984) ......................................................................7

*Maple Grove Health*,
   330 N.L.R.B. 775 (2000) ......................................................................7

*McGrath v. Auto-Body North Shore, Inc.*
   7 F.3d 665 (7th Cir. 1993) ..................................................................20

*Mississippi Power Co. v. NLRB*,
   284 F.3d 605 (8th Cir. 2002) ........................................................12, 13

*NLRB v. Allied Products Corp*,
   548 F.3d 644 (6th Cir. 1977) ..............................................................17

*NLRB v. Katz*,
   369 U.S. 736 (1962).............................................2, 3, 11, 16, 17, 19

*NLRB v. U.S. Postal Serv.*,
   8 F.3d 832 (D.C. Cir. 1993)........................................................3, 7, 15

*Oak Harbor Freight Lines, Inc. v. NLRB*,
   2017 LEXIS 7723 (D.C. Cir. 2017)....................................................11

*Omaha World-Herald*,
   357 N.L.R.B. 1870 (2011) ..................................................................13

*Pacific Nw. Newspaper Guild v. NLRB*,
   877 F.2d 998 (D.C. Cir. 1989)............................................................22

*Retail Clerks v. Lion Dry Goods, Inc.*,
   369 U.S. 17 (1962)..............................................................................15

*Shell Oil*,
   149 N.L.R.B. 284 (1964) ..............................................................16, 24

*Southern Nuclear Operating Co. v. NLRB*,
   524 F.3d 1350 (D.C. Cir. 2008).....................................................3, 7, 15

*UMWA 1974 Pension v. Pittston Co.*,
   984 F.2d 469 (D.C. Cir. 1993)............................................................11

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ........................................................................20

## **INTRODUCTION**

In their briefs, the National Labor Relations Board (the "Board") and Intervenor Union all but ignore the most critical aspect of this case: that E.I. du Pont de Nemours and Company ("DuPont" or "Company") and the Union entered into a binding *quid pro quo* agreement in the early 1990s regarding Union member participation in DuPont's BeneFlex Flexible Benefit Plan ("BeneFlex"). Neither the Board nor the Union disputes that the Union accepted the BeneFlex Plan, specifically including its reservation of rights provision, as the "price of admission" for Union participation in BeneFlex. Instead, they mistakenly argue the parties' agreement as to BeneFlex evaporated at the expiration of the parties' separate collective bargaining agreements ("CBAs") years after the fact. The Board and the Union's premise – that the reservation of rights clause in the BeneFlex Plan documents is nothing more than a general management rights clause that expires at the termination of the CBAs – is simply false.

The Board and Union further argue that the BeneFlex changes DuPont implemented in 2004-2005 constituted an unlawful deviation from the *status quo* because they were not automatic and involved employer discretion. That argument fails for several reasons. *First*, all of the parties' agreements, including the *quid pro quo* agreement as to BeneFlex, define the *status quo*, which the Board fails to acknowledge. *Second*, a large body of Board law – including many of the

1

cases cited in the Board's brief – conclusively shows that a series of changes implemented over time can establish a binding past practice, even though they are not automatic and involve employer discretion. *Third*, the 2004-2005 BeneFlex changes at issue are fully consistent with the *status quo* envisioned by the Supreme Court's decision in *NLRB v. Katz*, 369 U.S. 736 (1962) because in making those changes, DuPont continued to do what it had always done.

Indeed, adoption of the Board's theory would result in a significant deviation from the *status quo*. Applying the Board's decision would require DuPont to create one version of BeneFlex for Union employees at Louisville and a second version for Union employees at Edge Moor, with all other DuPont employees receiving different benefits under yet a third version of BeneFlex. Such an unprecedented result cannot reasonably be considered the "*status quo*" under any recognizable definition of the term.

Finally, the Board's retroactive application of its decision is inappropriate here, assuming *arguendo* that the Board's decision is valid. On remand, the Board did not conform its decision to prior precedent as instructed. Rather, it overruled a handful of cases that DuPont reasonably relied upon, some dating back 60 years, in a results-oriented attempt to sustain its initial decision and find DuPont guilty of a violation. Having found DuPont guilty, the Board then imposed its decision retroactively, without any substantive analysis that withstands scrutiny.

## **ARGUMENT**

I.   THE BOARD ARGUES FOR APPLICATION OF THE WRONG
     STANDARD OF REVIEW

Ignoring the parties' stipulations and the unambiguous BeneFlex reservation

of rights language, the Board argues it is entitled to substantial deference,

claiming:  (a) the case turns on questions of fact involving past practice; and (b)

the Board need only provide a "reasoned justification for departing from

precedent."   (Board Br. at 11).  The Board's characterization of the case and

applicable standard of review is simply wrong.

This case centers on the parties' express, *stipulated to*, agreement regarding

Union member participation in BeneFlex and application of the unambiguous

reservation of rights language found in the BeneFlex Plan documents.  No

deference is owed to the Board in cases involving the interpretations of the parties'

contractual agreements or in determining whether DuPont's actions were "covered

by" the parties' agreement as to BeneFlex.  *See Litton Financial Printing Division

v. NLRB,* 501 U.S. 190, 203 (1991); *Local 702,  Broth. of Elect. Workers v. NLRB*,

215 F.3d 11 (D.C. Cir. 2000); *Enloe Med. Cr. v. NLRB,* 433 F.3d 834, 839 (D.C.

Cir. 2005); *Southern Nuclear Operating Co. v. NLRB*, 524 F.3d 1350, 1358 (D.C.

Cir. 2008); *NLRB v. U. S. Postal Serv.*, 8 F.3d 832, 837 (D.C. Cir. 1993).

This case also hinges upon the Board's interpretation of past practice and the

*status quo* as set forth in the Supreme Court's decision in *Katz*.   This Court owes

the Board no deference with respect to interpretation of Supreme Court precedent. *See Allentown Mack Sales and Serv. Inc. v. NLRB,* 522 U.S. 359, 374-75 (1988); *also Jacoby v. NLRB*, 233 F.3d 611, 614 (D.C. Cir. 2000); *Cactus Canyon Quarries, Inc. v. FMSHRC,* 820 F.3d 12 (D.C. Cir. 2016). And this Court has repeatedly rejected the Board's failure to abide by prior precedent where, as here, the Board's decision reflects ad hoc, results-oriented decision-making.

## II.   THE BOARD ERRED BY IGNORING THE PARTIES' SPECIFIC, LONGSTANDING AGREEMENT AS TO BENEFLEX

The Board and Union argue that the BeneFlex changes at issue were unlawful because once the parties' CBAs expired DuPont was required to freeze all BeneFlex benefits for Union members in Louisville and Edge Moor to maintain the "*status quo*." (Board Br. at 13, 25-31; Union Br. 13, 23-28). That argument is fatally flawed because it ignores the parties' independent, *quid pro quo* agreement as to BeneFlex. The BeneFlex changes are "covered by" that separate agreement and are therefore lawful. And the Board's steadfast refusal to recognize and apply this Court's "covered by contract" analysis is not a valid excuse for depriving the parties of the benefit of their bargain. *See Heartland Plymouth Court MI, LLC, v. NLRB,* 650 Fed. Appx. 11 (D.C. Cir. 2016) (granting employer's motion for attorney's fees based on Board's unwarranted invocation of the "nonacquiescence"

4

doctrine to justify persistent rejection of this Court's "covered by contract" analysis).

A.   **The BeneFlex Changes Are "Covered By" The Parties' Agreement**

The Board argues that this Court's "contract-coverage" analysis does not apply because the parties' CBAs at Edge Moor and Louisville expired prior to implementation of the 2004-2005 changes.  (Board Br. at 36-37).   That argument wholly ignores the parties' stipulations and the Union's agreement to be bound by the reservation of rights provision in the BeneFlex Plan documents as a condition to Union member participation in BeneFlex.

There is no dispute that the parties specifically negotiated over DuPont's right to modify BeneFlex unilaterally on a nationwide basis.  The parties stipulated that in the early 1990s, the Union at Edge Moor and Louisville agreed to participate in BeneFlex in exchange for permitting DuPont to modify the Plan unilaterally on a nationwide basis.  Specifically, as to Edge Moor, the parties' stipulations state:

> During the 1993 negotiations over adoption of the BeneFlex Plan at Edge Moor, the [Union] agreed that, consistent with the terms of the BeneFlex Plan and the BeneFlex Medical Plan (collectively "the Plans") plan documents, [DuPont] would have the right to make changes to the Plans without bargaining with the [Union], and that such changes would be made on a U.S. Region-wide basis.  The [Union] agreed and accepted the Plans.

5

(JA, 626, ¶ 9).  Similarly, with respect to Louisville, the parties stipulated:

> During negotiation for the 1994 collective bargaining
> agreement, [DuPont] pointed out to the Union that under
> the terms of the BeneFlex Plan, [DuPont] would be
> permitted to alter the level and/or costs of benefits under
> the Plan on an annual basis.  [DuPont] also noted that any
> such changes would be made on a U.S. Region-wide
> basis.  ***Based on these understandings, the [Union]
> membership accepted the BeneFlex Plan.***

(JA 145, ¶ 7).  As part of the bargain, Union members obtained all of the benefits

from the economies of scale associated with being in a large, nationwide benefit

plan.  The price of admission for receipt of those valuable benefits was crystal

clear:  the Union agreed that its members were subject to all the governing

BeneFlex Plan documents, including the Plan's reservation of rights provisions.

The BeneFlex reservation of rights clause to which the Union expressly

agreed is clear and unambiguous, stating:

> The Company reserves the sole right to change or
> discontinue this Plan in its discretion provided, however,
> that any change in price or level of coverage shall be
> announced at the time of annual enrollment and shall not
> be changed during a Plan year unless coverage provided
> by an independent, third-party provider is significantly
> curtailed or decreased during the Plan Year.  Termination
> of this Plan or any benefit plan incorporated herein will
> not be effective until one year following the
> announcement of such change by the Company.

6

(JA 747).   This *agreed-upon* language has remained the same since BeneFlex was created and accepted by the Union.  (JA 747, 757, 778, 785, 787, 791, 793, 795).[1]

The parties' *quid pro quo* BeneFlex agreement had no durational limit and established the *status quo* for both parties, as confirmed by a decade of past practice.  Accordingly, the BeneFlex changes at issue are lawful under this Court's "covered by contract" analysis, which applies when, as here, a union has already exercised its bargaining rights over the specific subject at issue.  *See, e.g., Heartland Plymouth,* 650 Fed. Appx. 11; *Southern Nuclear*, 524 F.3d at 1358; *U.S. Postal Serv.,* 8 F.3d at 836.

Having stipulated to the parties' *quid pro quo* agreement, the Board and Union cannot and do not dispute the substance of that *quid pro quo* agreement. Instead, they claim that DuPont's benefit of the bargain expired with the parties' CBAs a decade later, while the Union's benefit of the bargain continued unabated. Specifically, the Board claims that the Court's contract coverage analysis is inapplicable because "BeneFlex covers Union employees *only by virtue of time-bound collective-bargaining agreements*" and once those CBAs expired the

---

[1]     The Board's reliance on cases such as *Maple Grove Health*, 330 N.L.R.B. 775 (2000), *Circle Imp Ex. Co.*, 244 N.L.R.B. 255 (1979) and *Luther Manor Nursing Homes,* 270 N.L.R.B. 949 (1984) is misplaced, as those cases arose during first contract negotiations where, unlike here, the employers and unions could not have had any pre-existing agreement pertaining to the subject matter of the changes at issue, much less a decade-long past practice reflecting the parties' agreement.

parties' longstanding "agreement as to how BeneFlex would apply . . . was no longer operative." (Board Br. at 34-37). In support of that fallacy, the Board cites to case law holding that "management rights clauses" contained in a collective bargaining agreement expire with the agreement in which they are found. *See* Board Br. at 33-35. That authority is entirely beside the point.

First, the reservation of rights language in the BeneFlex Plan documents is not a general management rights clause in a CBA. Rather, it is a specific and integral part of an entirely separate, standalone ERISA benefit plan, participation in which the Union readily agreed to on behalf of their members.

Second, the parties' *quid pro quo* agreement regarding BeneFlex was <u>not</u> dependent upon or coterminous with the parties' CBAs. At Edge Moor, the Union agreed to participate in BeneFlex in August 1993, during the term of the parties' pre-existing 1987 CBA. (JA 625). After reaching agreement, "[t]he parties' negotiated and executed a Memorandum of Agreement ("MOU") <u>to supersede</u> the language in Article XIV of the 1987 collective bargaining agreement and to <u>memorialize the [Union's] agreement to be bound by the terms of the BeneFlex Plan."</u> (*Id.*) (emphasis added). As stipulated, the parties' BeneFlex agreement was not dependent upon the CBA, but rather superseded it.

At Louisville, the Union agreed to participate in BeneFlex during the 1994 contract negotiations. At that time, the Union at Louisville agreed to the BeneFlex

Plan in its entirety, granting Union members the right to receive not only medical

coverage under the BeneFlex Medical Plan, but also dental and vision benefits, life

insurance, vacation "buy back" benefits, and financial planning services as well

under the other BeneFlex sub-plans.  Union members have enjoyed the full

panoply of BeneFlex benefit offerings since January 1, 1995, including those

under plans other than the BeneFlex Medical Plan.  Yet, none of the CBAs entered

into at Louisville following the parties' *quid pro quo* agreement makes any

reference to the full BeneFlex Flexible Benefit Plan.   Instead, the CBAs only refer

to the "BeneFlex Medical Plan" in the section of the CBAs that addresses medical

coverage.   Said differently, the Louisville CBAs have never provided Union

members with any contractual right to receive dental and vision benefits, life

insurance, vacation "buy back" benefits, or financial planning services benefits

under BeneFlex.   (JA 475-486, 503-504).   Rather, Union members' right to

receive such benefits is and has always been wholly dependent on the parties' *quid*

*pro quo* agreement which continues to define the terms of the Union's

participation in BeneFlex at Louisville.

Third, the Union accepted the entire BeneFlex Flexible Benefit Plan as an

indivisible package.  DuPont would not have permitted Union employees to

participate in BeneFlex without the Union's *quid pro quo* agreement because the

Company needed to retain the ability to modify BeneFlex for the tens of thousands

9

of employees at facilities nationwide – the vast majority of whom were <u>not</u> represented by the Union.   In fact, the BeneFlex Plan language specifically provides that union-represented employees may not participate in BeneFlex until and unless the Company has completed bargaining with the relevant unions regarding their acceptance of the Plan.  (JA 744, 749).

In short, the stipulated record confirms that the Union expressly agreed to be bound by all of the BeneFlex Plan documents, expressly including the reservation of rights provisions that provide DuPont with the contractual right to make the 2004-2005 BeneFlex changes at issue.  As such, the 2004-2005 BeneFlex changes are "covered by" the parties' contract, and this Court owes no deference to the Board with regard to the interpretation of the parties' agreement, as reflected by the stipulated bargaining history and the agreed-upon BeneFlex Plan documents. *See Litton Fin. Printing Div.,* 501 U.S. at 203; *Enloe Med. Ctr.,* 433 F.3d at 839; *Dep't of Navy v. FLRA,* 962 F.2d 48, 57 (D.C. Cir. 1992); *Heartland Plymouth,* 650 Fed. Appx. 11.

## III.   THE PARTIES' *QUID PRO QUO* AGREEMENT AS TO BENEFLEX DEFINES THE *STATUS QUO* AND REMAINS IN EFFECT

The Board's failure to give effect to the parties' BeneFlex agreement undermines its decision for a second, independent reason:  the "*status quo*" under

*NLRB v. Katz,* 369 U.S. 736 (1962) is defined by the terms of the parties'

contractual agreements, not just the past practice developed under such contracts.

### A.    The BeneFlex Changes Are Consistent With The Parties' BeneFlex Agreement

All of the parties' relevant agreements, not just those contained in the four

corners of a collective bargaining agreement, must be considered in assessing the

*status quo*. *See, e.g., UMWA 1974 Pension v. Pittston Co.,* 984 F.2d 469, 474 n.6

(D.C. Cir. 1993) (reviewing the terms relevant benefit fund documents, labor

contracts and other extrinsic evidence to determine the parties' post-contract

expiration obligations); *Oak Harbor Freight Lines, Inc. v. NLRB,* 2017 LEXIS

7723 (D.C. Cir. 2017) (enforcing terms of benefit documents at the expiration of

the parties' collective bargaining agreement).   As the Board in *Finely Hospital*

recently recognized:  "[T]he *status quo* must be viewed as a collective whole"

because "[p]reserving the *status quo* facilitates bargaining by ensuring that the

tradeoffs made by the parties in earlier bargaining remain in place."  *Finley Hosp.,*

362 N.L.R.B. No. 102, slip op. at 2 (2015), *enforcement denied*, 551, F.3d 772 (8th

Cir. 2016).  The Board's decision here fails to give effect to the negotiated trade-

offs previously made by the parties.

The 2004-2005 BeneFlex changes are clearly "in line" with the parties' *quid*

*pro quo* agreement, as that agreement gives DuPont the express right to modify

benefits unilaterally on a nationwide basis.  The importance of giving effect to the

parties' *quid pro quo* agreement as to BeneFlex was captured by Board Member

Schaumber, who observed in the Board's initial *DuPont* decision:

> The Respondent and the Union struck a deal, under
> which unit employees would receive the benefits
> provided by the Plan, subject to the Plan's terms and
> conditions, one of which is the Respondent's reservation
> of the right to make changes to the Plan. To hold the
> latter condition as a matter of law, to be a management
> rights clause, would be to create, post contract expiration,
> an arrangement to which the Respondent *never agreed*.
> The Respondent *never* agreed to provide benefits under
> the Plan uncoupled from the unilateral right to make
> changes therein. It agreed to provide those benefits
> *conditionally*, and those conditions are as much a part of
> the parties' agreement concerning benefits as are the
> benefits themselves. The law should operate to maintain
> the benefits agreement postcontract, not to change it by
> stripping out conditions.

*See DuPont Louisville,* 355 N.L.R.B. at 1089 (Schaumber dissent).

The Eighth Circuit applied a similar analysis in *Mississippi Power Co. v.*

*NLRB*, 284 F.3d 605 (8th Cir. 2002) when construing a union's *quid pro quo*

agreement regarding medical benefits. In *Mississippi Power*, the Board argued

that the employer's unilateral changes to its medical plan were not permitted by

the reservation of rights language contained in the plan documents because that

language was not incorporated into the parties' labor agreement and/or was not

acceded to by the union. The Eighth Circuit rejected that argument, finding that

the union's acceptance of the Company's "Medical Benefits Plan" required the

Court to give effect to all of the agreed-upon terms of that plan:

If medical insurance benefits are mandatory subjects of bargaining [over which Respondent had a duty to bargain], these terms and conditions of employment must be defined by the Medical Benefits Plan, the only document that describes them; and it is none other than the Medical Benefits Plan that gives the Company the power unilaterally to amend or terminate the benefits specified within it. ***It is irreconcilably inconsistent to argue that the medical insurance benefits, which are identified and delimited solely by the Medical Benefit Plan, are a mandatory bargaining subject when such an argument suits the Unions or the Board, but to insist that specific provisions of the document defining these very benefits need not be enforced when the Company is the one attempting to do so***. (Emphasis added)

The logic applied by the court in *Mississippi Power* applies with equal force here. The Union agreed to be bound by the BeneFlex Plan in its entirety, and therefore, the Court should enforce all of the agreed upon language, including the BeneFlex reservation of rights language, to fully effectuate the parties' *quid pro quo* agreement.[2] *See also H.K. Porter Co. v. Local 37, United Steelworkers of*

---

[2] The Board's cites *Omaha World-Herald,* 357 N.L.R.B. 1870 (2011) in support of its argument that the BeneFlex reservation of rights provision expired with the parties' CBA. (Board Br. at 20). *Omaha* actually supports DuPont's position. In *Omaha*, the Board analyzed unilateral changes made to an employer pension plan and 401(k) plan. The Board ruled that the unilateral changes to the company-wide pension plan were lawful pursuant to the agreed upon plan documents. In so ruling, the Board recognized that the parties' rights could "only be understood by examining the plan's prior operation and the governing plan documents." (*Id.* at 1871). In *Omah*, as here, the "plan documents include[d] reservation of rights language, which expressly provides that the 'Employer shall have the right at any time to amend the Plan'" (*Id.*).

*America*, 264 F. Supp. 203 (S.D.W.Va. 1967) (recognized that courts should not read provisions of labor contracts so narrowly that a party will be deprived of rights he indicated every intention of retaining).

The Board's refusal to give effect to the parties' BeneFlex agreement is inconsistent with the law and defies common sense.   The following example is illustrative.   Assume an employer and union enter into an agreement whereby the Union agrees that the employer has the right to subcontract bargaining unit work, within its discretion, and in exchange the employer agrees to give all union employees an annual wage increase equal to three percent (3%) each year ("the Subcontracting-Annual Wage Agreement").   Assume further that the parties enter into subsequent CBAs that contain a provision stating that the employer's right to subcontract and the employees' right to an annual wage increase are subject to the terms of the parties' Subcontracting-Annual Wage Agreement.   Finally, assume that each year, for 10 years, the employer subcontracted different aspects of

---

The Board also ruled the changes to the 401(k) plan were unlawful.   In reaching that conclusion, the Board noted that the union <u>could not</u> "have been said to have acceded to the reservation of rights language in the plan documents" because the employer's "401(k) plan and its governing documents were created <u>after</u> the parties had negotiated their collective bargaining agreement." (*Id.* 1873, n.14).   Accordingly, there was no evidence that employee participation in the 401(k) plan was contingent upon the Union's agreement to the plan's reservation of rights provision.   The opposite is true here, as the Union specifically agreed to the BeneFlex reservation of rights provision in exchange for the right to participate in BeneFlex subject to the terms of the Plan.   (JA 145, 626).

bargaining unit work to various third parties and granted employees the 3% annual wage increase.

Applying the Board's logic in this case, the Board would argue that the employer in this example would be <u>required</u> to abide by its part of the bargain and continue granting the fixed 3% annual wage increase, even after expiration of the parties' CBA. *See* Board Br. at 28. Yet, the Board, ignoring the parties' longstanding agreement and focusing solely on the expiration of the CBA, would insist that the employer could not continue to subcontract work following expiration of the CBA because it involves the use of employer discretion. (Board Br. at 25-29). Such a result is contrary to law and reason because it fails to give effect to the parties' enforceable agreement. *See, e.g., Line Drivers Local 961, IBT v. W. J. Digby, Inc.*, 341 F.2d 1016, 1019 (10th Cir. 1965) (effect must be given to the design of a labor contract to ensure that neither party is permitted to interfere with the other's right to the fruits of his bargain); *see also Southern Nuclear*, 524 F.3d at 1358; *U.S. Postal Serv.,* 8 F.3d at 836.[3]

---

[3]    The Board suggests that the parties' agreement regarding BeneFlex cannot be enforced unless it is contained in a formal collective bargaining agreement. *See* Board Br. at 34-37). Courts have long rejected that notion, repeatedly finding that enforceable labor "contracts" include more than formal collective bargaining agreements, and include any agreement between an employer and labor organization regarding terms and conditions of employment. *See Retail Clerks v. Lion Dry Goods, Inc.,* 369 U.S. 17, 26-28 (1962); *see also In re Gen. Motors,* 3 F.3d 980, 983 (6th Cir. 1993) (the term labor contract "is not limited to collective bargaining agreements, but can embrace understandings other than those usually

B.    **The 2004-2005 BeneFlex Changes Are Consistent With The 10-Year Past Practice Of Prior BeneFlex Changes**

The Board claims that DuPont's history of unilateral changes cannot form the *status quo* under *Katz* because DuPont exercised discretion in making the changes.  (Board Br. at 25-28, 37-43).  As a result, the Board expressly overruled its own prior decisions in *Courier-Journal, Inc.,* 324 N.L.R.B. 1093 (2004), *Capital Ford,* 343 NLRB 1058 (2004), *Beverly Health & Rehab. Servs., Inc.,* 346 NLRB 1319 (2006) and *Shell Oil*, 149 N.L.R.B. 284 (1964), claiming that, aside from those specific cases, Board has consistently held past practice can establish the *status quo* under *Katz* only if the past practice was developed based on objective, fixed criteria.  (Board Br. at 19-31).  The Board's argument is not supported by the law or the facts.

As an initial matter, the Board has held repeatedly – in cases other than those overruled by Boards' decision below – that a history of repeated unilateral actions does create a binding past practice even if those actions involve substantial employer discretion.  In *Daily News of Los Angeles*, 315 N.L.R.B. 1236, 1238-

---

understood as collective bargaining agreements, including collective-bargained pension plans and other employee benefits agreements"); *Local Union No. 115, United Ass'n of Journeymen and Apprentices of Plumbing and Pipe Fitting Indus. v. Townsend & Bottum, Inc*., 383 F. Supp. 1339 (W.D. Pa. 1974),  *aff'd,* 521 F.2d 1399 (3d Cir. 1975) ("any agreement, written or unwritten, formal or informal, which purports to resolve employment controversies between [employers] and unions" may be enforced).

1239 (1994), the Board confirmed, in direct response to this Court's inquiry, that

the analysis of the *status quo* under *Katz* is identical whether an employer

implements a new benefit or discontinues an existing benefit in contravention of

an established past practice.  Consistent with that premise, the Board has not

hesitated to find an established past practice based on actions that involve more

discretion than DuPont exercised with regard to the BeneFlex changes here.

In *Litton Microwave Cooking Prods*, 300 N.L.R.B. 324 (1990), *enf'd*, 949

F.2d 249 (8th Cir. 1991), for example, the Board held that the employer violated

Section 8(a)(5) by discontinuing its practice of granting a merit increase every

February in amounts determined solely in the employer's discretion.  The Board

reached the same result in *General Motors Acceptance Corp.,* 196 NLRB 137

(1972), finding that the employer had a binding past practice of granting merit

increases, even though the employer retained discretion regarding the assessment

of each employee's performance and the amount of merit increase that was

awarded.   Similarly, in *NLRB v. Allied Products Corp.*, 548 F.3d 644 (6th Cir.

1977), the Sixth Circuit upheld the Board's finding that the employer unlawfully

discontinued a practice of merit increases that were fixed as to timing but

discretionary in amount.  And in *Auto Workers (Udylite Corp.) v. NLRB,* 455 F.2d

1357, 1365 (D.C. Cir. 1970), this Court upheld the Board's finding that the

employer unlawfully discontinued an established past practice of merit increases,

regardless of whether the "increases pursuant to the [employer's] merit review plan were *wholly discretionary."*

In its brief, the Board argues that the decisions in *Dynatron/Bondo Corp.*, 323 N.L.R.B. 1263 (1997) *enf'd n relevant part*, 176 F.3d 1310 (11th Cir. 1999) and *Eastern Maine Med. Ctr. v. NLRB* 658 F.2d 1, 7 (1st Cir. 1981) are consistent with the majority's decision below because they do not involve discretionary changes.  (Board Br. at 31, n. 13).  The Board's characterization of the cases demonstrates the ease with which the Board manipulates the analysis of past practice and the *status quo* to reach a desired result.

In *Dynatron/Bondo Corp.*, 323 N.L.R.B. 1263 (1997), the employer had a five-year history of granting merit wage increases.  Employees who completed their probationary period received a "90-day merit increase" 64% of the time in 1990, 91% of the time in 1991, 53% of the time in 1992 and only 40% of the time in 1993.  *Id.* at 1263.   Regular employees received annual merit increases 54% of the time in 1998, 86% of the time in 1999, 58% of the time in 1990, 100% of the time in 1990, and 83% of the time in 1991.  *Id.*  The amount of the merit increases granted also varied significantly from employee to employee, ranging from 1.5% to 8.3% in 1988, 1.5% to 8.5% in 1989, 2.4% to more than 6% in 1990, 2.2% to 4% in 1991, and 2.1% to 9.9% in 1992.  *Id*. at 163-64, n. 6-10.

While the employer in *Dynatron/Bondo* had a general practice of granting merit increases, the granting of merit increases was anything but fixed or "automatic."   Indeed, in some years, 100% of the employees received merit increases, and in other years only half the employees received increases.  And the amount of the merit increases was highly discretionary, varying widely from employee to employee and year to year.  Discounting the highly discretionary aspect of the wage increases, the Board found that the employer had an "'established pattern and practice' of granting increases based on merit" and violated the Act by discontinuing that established term and condition of employment.

The Board also mischaracterizes its decision in *Eastern Maine Medical*. (Board Br. at 13, n. 31).  There the employer had a practice of increasing wages annually to keep up with inflation and community wage patterns.  658 F.2d 7. After its employees had been organized, the employer froze wages, claiming that was required to do so to maintain the *status quo* under *Katz.  Id.* at 8.  The employer argued that annual wage increases were not an established condition of employment because the amount of any future wage increase was left to the discretion of the employer.  The Board disagreed, and the First Circuit upheld the Board's decision stating, "[i]ndefiniteness as to the amount and a flavor of discretion" did not matter under *Katz*.  *Id*.

19

The Board's characterization of acceptable "employer discretion" in cases such as *Daily News of Los Angeles, Litton Microwave, Dynatron/Bondo, Eastern Maine* – cases the Board *does not* purport to overrule – cannot be reconciled with its decision here. Indeed, DuPont's discretion in this case was more limited than in any of those cases.

As the Board concedes, all of the BeneFlex changes that form the parties' 10-year past practice were implemented on a "fixed" date: January 1. (Board Br. at 41). Accordingly, employees clearly had a reasonable expectation that DuPont would modify BeneFlex each year on January 1. In addition, consistent with the parties' *quid pro quo* agreement, all of the unilateral changes were implemented nationwide, applying equally to all employees, union and non-union alike. And DuPont did not have the discretion to implement unilateral changes during a Plan year based on the specific limitations set forth in the Plan's reservation of rights language. Moreover, because BeneFlex is governed by ERISA, DuPont had a fiduciary duty, imposed by law, to follow the terms of the BeneFlex Plan documents. *See* 29 U.S.C. § 1132(a) (1)(B); *McGrath v. Auto-Body N. Shore, Inc.* 7 F.3d 665, 670 (7th Cir. 1993). Finally, the record shows that DuPont reviewed

20

the benefits offered by its "frame of reference companies and the industry in general" when it considered its annual changes. (JA 44). [4]

In 2004 and 2005, DuPont, in line with its consistent past practice, adjusted benefit premiums. DuPont's past practice of premium adjustments prior to implementing the BeneFlex changes at issue here was longer, more consistent year to year, and significantly less varied in amount than the past practice of merit wage increases the Board has found established in cases such as *Dynatron/Bondo Corp., Litton Microwave,* and *Daily News of Los Angeles.* DuPont also adjusted benefit levels after taking into account the benchmarks set by DuPont's frame of reference companies, and its industry. If implementing merit wage increases based on wage surveys is sufficiently objective to create an established past practice in *Eastern Maine*, as the Board now contends (*See* Board Br. at 31, n.13), then DuPont's implementation of changes based on its benchmark companies, along with the

---

[4]      The Board's reliance on *Caterpillar, Inc.*, 355 N.L.R.B. 521 (2010) is misplaced. *See* Board Br. at 25, 27, 41. In *Caterpillar*, the union challenged the employer's unilateral implementation of a "generic first" prescription drug program. The employer failed to offer any evidence as to the number or frequency of the prior changes in support of its past practice argument. (*Id.* at 522). Given that paltry showing, the Board concluded that the employer failed to demonstrate an established past practice. Unlike in *Caterpillar*, the record here shows that DuPont implemented numerous unilateral changes, on the same day, following the same process every year over a ten-year period. In short, DuPont did what it had always done when it implemented the 2004-2005 BeneFlex changes at issue here, including the annual adjustments to benefit premium costs and benefit coverage levels.

other restrictions on its discretion, must be considered sufficiently objective as well.

In its zeal to find a violation in this case, the Board attempts to reconcile the irreconcilable, as there is no principled distinction between the degree of employer discretion applied in cases such as *Daily News of Los Angeles, Litton Microwave, Dynatron/Bondo, Eastern Maine* and the discretion involved in this case. In its brief, the Board acknowledges, as it must, that there is no identifiable standard with respect to how much employer discretion is too much to establish a binding past practice, but argues the Board is not required to identify a bright-line rule. (Board Br. at 45). A review of the Board's decision, however, demonstrates that there is no standard at all. Indeed, the only constant appears to be the Board's willingness to manipulate the applicable standard to find a violation based on an employer's action or inaction. That is precisely the kind of ad hocery this Court has cautioned against. *Pacific Nw. Newspaper Guild v. NLRB,* 877 F.2d 998, 1003 (D.C. Cir. 1989) (Board must provide a "reasoned justification" for its decision "under a legal theory that permits a [party] reasonably to 'predict' whether a particular practice will be lawful or not . . . we sanction impermissible 'ad hocery' on the part of the Board which is the core concern underlying the prohibition of arbitrary or capricious agency action.").

Finally, the Board argues that permitting DuPont to make the unilateral changes at issue "would not serve the overall goal of the *status quo* doctrine to promote stability in the bargaining relationship." (Board Br. at 25). That argument has no basis in law or fact. The Union agreed to the entire BeneFlex Plan, which provides a wide array of benefits, including medical, dental, vision, life insurance, and vacation "buy back" benefits as well as financial planning services. Those benefits are administered pursuant to a written ERISA plan that contains detailed provisions regarding not only the type and level of benefits provided, but also terms regarding eligibility for and administration of the benefits provided. While DuPont has modified BeneFlex every year to keep up with its benchmark companies, the vast majority of the Plan has remained the same from one year to the next. Accordingly, the *status quo* assessed under any reasoned standard, and against the backdrop of the parties' agreement, simply requires Union-represented employees to remain eligible to receive benefits under the plan, and permits DuPont to modify the Plan in the same way it has always done, year in and year out. If either the Company or the Union wanted to alter the *status quo*, they could have negotiated to have Union employees receive benefits under some other benefit plan. Until and unless such negotiations take place, the best means "to promote stability in the bargaining relationship" is to maintain the *status quo*

23

by having both parties continue to abide by the BeneFlex agreement that was in place for a decade prior to 2004-2005, and continues in place to this day.

## IV.  THE BOARD'S REMEDIAL ODER IS ARBITRARY AND CAPRICIOUS

The Board argues that it was appropriate to apply its decision retroactively. (Board Br. at 47-50).  In support of that argument, the Board argues that DuPont should have been aware of the "tension" that existed between the case law DuPont relied on and the case law the Board overruled.  (*Id*. at 48-49).  The Board's position is remarkable for several reasons.

As an initial matter, the Board itself was not willing to acknowledge any meaningful "tension" between *Courier Journal*, *Capitol Ford* and *Beverly* before the Court's remand in this case.  Indeed, when this case first came before this Court in *E.I. DuPont de Nemours & Co. v. NLRB*, 682 F.3d 65 (D.C. Cir. 2012), the Board argued that the legal standard set forth in *Courier Journal* was the appropriate legal standard but argued that this case was <u>factually</u> distinguishable because DuPont had no history of making unilateral changes during hiatus periods between contracts.  It was only after this Court rejected that argument that the Board decided, incorrectly, that *Courier Journal*, *Capitol Ford, Beverly* and *Shell Oil* should be reversed.

Moreover, DuPont certainly had no prior notice that the Board might attempt to overrule 50 years of Board law starting with *Shell Oil*.  Indeed, in *Arc*

*Bridges v NLRB*, 662 F.3d 1235 (D.C. Cir. 2011), the Board was still taking the position that an employer's use of discretion was "not significant" and no bar to finding an established past practice.  If the Board was advancing that position before this Court in 2011, then it would be manifestly unjust to require DuPont to have predicted the Board's reversal of position years earlier in 2004 and 2005.

## CONCLUSION

For the forgoing reasons, the Court should grant DuPont's Petition for Review, deny the Board's cross-application for enforcement, and vacate the Board's decision.

For E. I. du Pont de Nemours and Company

/s/ *Thomas P. Gies*
Thomas P. Gies
Crowell & Moring, LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2852

September 15, 2017

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*6,062*] words.

[    ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.     This brief document complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: September 15, 2017          /s/ Thomas P. Gies
                                                      *Counsel for Petitioner*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 15th day of September, 2017, I caused this Reply Brief of Petitioner to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

David S. Habenstreit
Jill A. Griffin
Joel A. Heller
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, S.E., Suite 8100
Washington, D.C. 20570
(202) 273-2960
david.habenstreit@nlrb.gov
jill.griffin@nlrb.gov
joel.heller@nlrb.gov

*Counsel for Respondent*

Matthew J. Ginsburg
James B. Coppess
Katharine J. Shaw
AFL-CIO
815 Sixteenth Street, N.W.
Washington, D.C. 20006
(202) 637-5397
mginsburg@aflcio.org
jcoppess@aflcio.org
kshaw@usw.org

*Counsel for Intervenor*

I further certify that on this 18th day of September, 2017, I caused the required copies of the Reply Brief of Petitioner to be hand filed with the Clerk of the Court.

/s/ Thomas P. Gies
*Counsel for Petitioner*